28 F.3d 109
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Leslie William JANTZER, Defendant-Appellant.
 No. 93-30240.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted May 5, 1994.
Decided June 17, 1994.
 
 Before: ALARCON, NORRIS and LEAVY, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Thomas Jantzer seeks reversal of the judgment of conviction for theft in violation of 18 U.S.C. Sec. 641 and depredation of government property in violation of 18 U.S.C. Sec. 1361. He contends that the evidence is insufficient to establish that he had actual knowledge of the theft and destruction of government property, or that he had a subjective awareness of a high probability that (1) the true boundaries of a government timber sale had been destroyed so that additional timber could be taken; and (2) leave trees from Unit 2 were taken that did not create a hazard to the cutters and loggers.
 
 
 3
 The Government contends that the evidence presented at trial was sufficient to show that Jantzer or someone under his direction committed these violations. The Government also argues that the evidence establishes that Jantzer had actual knowledge, or deliberately and purposefully contrived to avoid learning, that (1) the boundaries had been altered and trees were cut outside the boundary line; and (2) leave trees within the legitimate boundary lines of Unit 2 were taken without the Government's consent or proper justification.
 
 
 4
 A conviction must be upheld if, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). We reverse the judgment because the evidence is insufficient to persuade a rational trier of fact that Jantzer had actual knowledge before the fact that trees belonging to the United States would be cut illegally, that he cut trees not authorized by the timber sale, that he directed someone else to do so, or that he deliberately avoided learning the true facts so that he would have a defense should he be subjected to prosecution.
 
 
 5
 To support a conviction for the crimes of theft and depredation, the Government had the burden of persuading the trier of fact that the defendant knowingly took government property without authorization, United States v. Bigelow, 728 F.2d 412, 413 (9th Cir.), cert. denied, 469 U.S. 868 (1984), and knowingly destroyed government property, United States v. Seaman, 18 F.3d 649, 650 (9th Cir.1994), or that he was deliberately ignorant. To prove deliberate ignorance, the Government must show that the defendant was aware of a high probability of the existence of the fact in question and purposefully contrived to avoid learning all the facts in order to have a defense in the event of a subsequent prosecution. United States v. Sanchez-Robles, 927 F.2d 1070, 1073 (9th Cir.1991).
 
 I.
 
 6
 The Government maintains that the testimony of Jeff White, Jantzer's foreman, Bruce Dunn, a harvest operations specialist for the Department of Natural Resources, and Special Agent Gregory Assmus, a criminal investigator with the Bureau of Land Management, concerning Unit 2 establishes that Jantzer had the requisite mental state to sustain a conviction for theft and depredation. We have reviewed the record of that testimony. It does not support the Government's position.
 
 
 7
 The Government asserts that "the testimony of Jeff White was that Jantzer told him and his crew to cut anything in Unit 2 that even remotely resembled a leave tree." Appellee's Brief at 31. The record does not support this paraphrase of White's complete testimony before the petit jury.
 
 
 8
 White testified on direct examination that he could not recall making a statement to investigating agents that Jantzer had told him to instruct the cutters to cut "any tree that was marked as a leave tree which could even remotely be considered a hazard, unless Jantzer instructed him to do otherwise." Reporter's Transcript (RT) Vol. V at 82, 84. White also did not recall stating that he "could not figure out why Jantzer wanted them cut, and morally disagreed with Jantzer's decision, but ended up cutting them anyway because Jantzer was the boss." RT Vol. V at 84. White acknowledged, however, that prior to his testimony before the grand jury, he reviewed the agent's summary of his statement and stated it was correct. RT Vol. V at 82-83.
 
 
 9
 On cross-examination, White explained that the instruction Jantzer gave him was that "[i]f there was a safety hazard, to cut it." RT Vol. V at 102. White asserted that Jantzer and the United States Forest Service (Forest Service) disagreed about safety trees. According to White, the Occupational Safety and Health Act (OSHA) allowed them "to cut whatever safety trees [the cutters] think need to be cut," but that under the Forest Service contract, "you're supposed to have permission" to cut a leave tree. RT Vol. V at 102. White stated that conflict between the Forest Service contract and OSHA is a common problem because there are some situations "where you have to cut them. They are a hazard." RT Vol. V at 102, 106.
 
 
 10
 Contrary to the Government's assertion, White's trial testimony established that Jantzer did not tell him to cut anything that resembled a leave tree. The record shows that Jantzer's instructions were to cut trees that presented a safety hazard.
 
 
 11
 The Government argues that testimony of Dunn established that most of the leave trees taken from Unit 2 did not present a safety hazard. Dunn examined the stumps of the cut leave trees in Unit 2 to determine whether there was a safety reason for taking the designated trees. Dunn testified that a legitimate safety reason existed for the taking of only two of the "thirty or so" leave trees in Unit 2. RT Vol. V at 153. This evidence, when considered in connection with White's testimony, demonstrated that the person who cut leave trees that did not present a safety hazard violated Jantzer's instructions. It does not prove that Jantzer had actual knowledge that trees that did not constitute a safety hazard were being cut, or that he deliberately ignored the facts.
 
 
 12
 Dunn also testified regarding the discrete styles used to cut the leave trees in Unit 2. Assmus testified that Jantzer demonstrated his cutting style. The Government argues that this evidence proves that Jantzer cut the leave trees in Unit 2. We disagree.
 
 
 13
 Dunn testified that, in his opinion, the cutting techniques of the cutters in Unit 2 created the safety hazard that required the cutting of the trees. RT Vol. V at 136-52. Dunn asserted that the techniques used by the cutters caused a number of the leave trees to become entangled with other trees. RT Vol. V at 140. Dunn also examined the stumps of the leave trees in Unit 2. He determined that they were cut by three persons, whom he labeled cutters A, B, and C. RT Vol. 5 at 156-57. Dunn also determined that the trees were cut at different times. RT Vol. V at 168. Dunn opined that cutter C had cut some of the eight leave trees that had black paint covering the Forest Service's orange marked stumps. RT Vol. V at 159-166.
 
 
 14
 On cross-examination, Dunn acknowledged that the cutters had to accommodate the skidding pattern in Unit 2. RT Vol. V at 194, 196. Dunn admitted that he had not examined the necessity of cutting certain of the leave trees because of the skidding pattern. RT Vol. V at 193, 196. He also admitted that there were professional cutters who would disagree with his position that certain hazard trees should be marked and left standing. RT Vol. V at 201. He stated that logging safety codes disallow leaving a "tree hung up and walking away from it. It has to be taken care of.... Can't be left for an unsuspecting rigger to come and work under later on." RT Vol V at 123.
 
 
 15
 Assmus testified that during his interview of Jantzer, Jantzer drew a diagram of the method by which he cuts trees. Assmus did not preserve the original diagram. Assmus testified that Jantzer described his method of cutting as "Humboldts and squares." RT Vol. V at 23. Contrary to the Government's assertion, Assmus' testimony did not "establish [that] Jantzer's description of his own cutting style [was] equivalent to cutter C." Appellee's Brief at 32. The Government failed to present evidence that Dunn had examined the diagram of Jantzer's cutting style. Dunn did not testify that Jantzer was cutter C. The circumstantial evidence did not establish that Jantzer cut any of the leave trees from Unit 2.
 
 
 16
 The Government also relies on the fact that black and orange paint and blue ribbon were found in Jantzer's truck to demonstrate circumstantially that he disguised the leave trees to avoid detection. This contention is frivolous. The record reveals that scientific examination proved that the paint and the ribbon did not match the black and orange paint and blue ribbon used by the person who illegally took Government timber from Units 2 and 3.
 
 
 17
 The Government also argues that Jantzer's knowledge of the altered boundary in Unit 2 is demonstrated by his admission to Assmus that Jantzer had watched Alan Karjala, the Forest Service Timber Sale Administrator for the BTS, reset the boundary of Unit 2 and did not object. Jantzer told Assmus that he saw Karjala reset the boundary of Unit 2. The fact that Jantzer did not object to Karjala's resetting of the boundary does not tend to prove that Jantzer altered the boundary or that he had a subjective awareness of a high probability that the boundary had been altered.
 
 
 18
 In sum, the evidence relied on by the Government does not permit an inference that Jantzer, or someone at his direction, altered the boundary in Unit 2. The evidence is also insufficient to prove that Jantzer, or someone at his direction, cut leave trees in Unit 2 without justification. Likewise, no rational trier of fact could have reasonably concluded from the evidence in this record that Jantzer contrived to avoid learning that the boundary in Unit 2 had been altered and that leave trees were being taken from Unit 2 without justification.
 
 II.
 
 19
 The Government asserts that the evidence was sufficient to demonstrate that Jantzer had actual knowledge of the boundary alteration in Unit 3. The Government argues that the map of Unit 3 and the logging feasibility analysis prepared by Jantzer's employee, Alan Matricardi, put Jantzer "on notice in 1983 where the original boundaries were in Unit 3 of the BTS." Appellee's Brief at 34.
 
 
 20
 When the Matricardi map was recovered from Jantzer during a consent search of his home, the map contained a red outline of the expanded area of Unit 3. Matricardi testified that he did not make the red outline of the expanded area of Unit 3 when he originally prepared the map. The Government contends that this evidence permits an inference that Jantzer made the red outline of the expanded area of Unit 3 on the map. No such inference is permissible from this record.
 
 
 21
 Jantzer told the agents that he had obtained the Matricardi map and feasibility plans from Jeff White. RT Vol. IX at 41. Jeff White testified that either he or Karjala made the red outline of the expanded area of Unit 3 on the Matricardi map during one of the numerous times they had looked at the logging plans to ascertain what had happened. RT Vol. V at 100-101.
 
 
 22
 The Government further asserts that the fact that Jantzer had White measure the skyline corridors of Unit 3 demonstrates circumstantially that Jantzer was aware of the location of the true boundary of Unit 3 before the timber was cut. The Government reasons that Jantzer was already aware of the southern boundary of Unit 3 because of the map drawn by Matricardi. The record does not support the Government's assertion that Jantzer had asked White to measure the southern boundary of Unit 3 when Jantzer already knew, from Matricardi's map, the location of the southern boundary.
 
 
 23
 Matricardi testified that in 1983 he prepared a skyline logging feasibility plan, which included a map of Unit 3. RT Vol. III at 136-39. The map of Unit 3 that he had prepared did not have notations of the distances of the skyline corridors on it. RT Vol. III at 143. Matricardi testified that he did not discuss the map of Unit 3 in detail with Jantzer because Jantzer was involved in the ongoing logging operations. RT Vol. III at 144-45.
 
 
 24
 White also testified that Jantzer asked him to measure the lengths of the skyline corridors so that they could buy new cable line for the yarder machine. RT Vol. V at 68. Jantzer told him to find the southern boundary and to measure it from the landing to the boundary. RT Vol. V at 77, 92. White walked down along the unit, following what he saw as the southern boundary. RT Vol. V at 92. After he measured the unit, the cable for the yarder was purchased and installed. RT Vol. V at 72-73.
 
 
 25
 This evidence proves that a new skyline corridor cable was needed for the yarding of Unit 3 and that Jantzer asked White to obtain the proper measurements for the length of the cable. White used Matricardi's map in logging and he measured the southern boundary of Unit 3. It does not prove that Jantzer had actual knowledge of the altered boundary line in Unit 3.
 
 
 26
 The Government also argues that Janzter's actual knowledge of an altered boundary line was established by his admission that one of his cutters had told him that there was an indistinct boundary line and no leave trees in Unit 3. The record demonstrates, however, that Jantzer told the agents that he ordered his cutter to go "in the middle of the unit where he knew he was inside the unit and fall and buck along the creek where he knew he would be safe." RT Vol. IX at 86. Jantzer also told the agents that he had told Karjala about the cutter's statement to him. RT Vol. IX at 14, 17. Because Karjala never said anything to Jantzer concerning the report, Jantzer assumed there was no problem with Unit 3. RT Vol. IX at 17.
 
 
 27
 The Government asserts that Karjala denied that Jantzer had told him there was a boundary problem in Unit 3. The testimony as to whether Karjala was contacted by Jantzer or someone at his direction concerning Unit 3 was conflicting. Karjala testified on direct examination that although he had been contacted in other sales when a situation like this occurred, he was "never contacted at all" at his home or his office during the cutting in unit 2 and Unit 3. RT Vol. IV at 185. He further stated that no one in Jantzer's operation solicited his help in identifying the location of the boundaries, and he was not contacted regarding any questions concerning multiple boundaries. RT Vol. V at 3-4. On cross examination, however, Karjala acknowledged that, prior to his discovery of the altered boundary in Unit 3, he might have been asked to check the cutting in Unit 3. Karjala testified as follows:
 
 
 28
 Q. Now, when you made that walk up Bitterlick Creek and saw that on that occasion, you had been given some indication by the company that they were down there cutting; is that correct?
 
 
 29
 A. That's possible, yes.
 
 
 30
 Q. Well, you wouldn't have walked up that creek unless you thought there was timber falling going on there, because that's what you went there to see?
 
 
 31
 A. That's true.
 
 
 32
 Q. So somebody connected with the company said, "We're falling down in Unit 3, if you want to come and inspect it," or "Why don't you go inspect it," or something?
 
 
 33
 A. They probably told me they were cutting.
 
 
 34
 Q. And they would have told you that, knowing that you were the person who was supposed to inspect the cutting?
 
 
 35
 A. That's correct.
 
 
 36
 Q. Do you remember who it was that told you?
 
 
 37
 A. No, I don't.
 
 
 38
 Q. Do you remember what it was that person said to you?
 
 
 39
 A. No, I don't.
 
 
 40
 RT Vol. V at 29. Karjala's uncertain testimony regarding whether he was requested to inspect the cutting in Unit 3 does not establish that Jantzer had actual knowledge of an altered boundary in Unit 3 or that he deliberately ignored evidence that it had been altered.
 
 
 41
 The Government argues that an experienced logger would have known that the boundary of Unit 3 had been altered because it had no leave trees. The record shows that Jantzer went into Unit 3 only once before the cutting took place. RT Vol. IX at 59-60. Jantzer walked near the creek. RT Vol. IX at 60-61. He saw a boundary tag. RT Vol. IX at 60. During the cutting, Jantzer viewed Unit 3 from the landing. RT Vol. IX at 17, 64. Karjala testified that it was not possible, from a position on the landing, to see that trees had been taken outside the southern boundary line until all the trees in Unit 3 had been cut. RT Vol. V at 33.
 
 
 42
 The Government's evidence was insufficient to persuade a rational trier of fact that Jantzer had prior knowledge that the boundary of Unit 3 had been altered, or that he deliberately ignored facts so that he could later testify that he did not know of the illegal cutting. Because the evidence of guilt is insufficient, we do not reach the other issues raised by Jantzer in his attack on the judgment.
 
 
 43
 REVERSED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3